UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JENNETTE SUAREZ AND JERRY MASCOLO,

                    Plaintiffs,        **MEMORANDUM AND ORDER**

              -against-              11-CV-05812 (SLT) (VMS)

THE CITY OF NEW YORK and
ALLIEDBARTON SECURITY SERVICES LLC

                    Defendants.
-----------------------------------------------------------------x

**TOWNES, United States District Judge:**

        Jennette Suarez and Jerry Mascolo (collectively, "Plaintiffs")[1] commenced this action against the City of New York (the "City") and AlliedBarton Security Services, LLC ("Allied"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* (the "NYCHRL"). The only claim asserted by Plaintiffs against Allied is a state law claim brought pursuant to the NYCHRL for allegedly subjecting Suarez to a hostile work environment. Allied, the sole movant, now moves for summary judgment under Fed. R. Civ. P. 56 on that claim. For the following reasons, the motion is granted.

### *BACKGROUND*

        The following facts are undisputed, or, where disputed, taken in favor of the non-moving party. On November 6, 2006, Suarez was hired by the City to serve as a "deckhand" on the Staten Island Ferry (the "Ferry"), which is owned and operated by the New York City Department of Transportation (the "DOT"). (Complaint ¶¶ 9-10.) Suarez remained an employee of the DOT as a deckhand until November 18, 2011, when she was terminated by the DOT. (*Id.*

---

[1] The Complaint was filed by both parties. For the purposes of this motion, only Suarez's claim against Allied is considered. Jerry Mascolo has no claims against Allied.

1

¶ 37; Pl. Dep. Tr. 128:10.) At no point during Suarez's employment was she ever employed by defendant Allied. (Pl. R. 56.1 Stmt. ¶ 2.)

*Allied Security Services*

Allied provides security services for the City at the Ferry's St. George terminal site. (McArdle Dep. Tr. 5-6; Warren Dep. Tr. 5-6.) As a contractor for the City, Allied is subject to the City's Agency Contract Administration Guidelines (the "Guidelines"), the New York State Office of General Services Contract ("General Services Contract"), and the New York City Mini-Bid Award Contract ("Mini-Bid Contract") (collectively, the "Agreements"). (Exhibit 1 on Reply, Dkt. No. 62-27.) The Guidelines set forth various terms and conditions applicable to City contractors, dictating, *inter alia*: employment eligibility criteria, background checks, drug testing procedures, weekly duty rosters, lunch hours, and relief guards assigned during lunch breaks. (*Id.* at 5-15.)[2] Allied's personnel decisions are also subject to City approval. (*Id.* at 11.) Along with the Guidelines, the General Services Contract mandates additional conditions, such as: the allocation of uniforms, the specifications of such uniforms, the standard equipment to be provided by Allied, general restrictions on employment, log book entries, hours of standard work days, employee wage rates, overtime payment, and observed holidays. (*Id.* at 22-50.) In addition, the Mini-Bid Contract imposes further requirements upon Allied, including: protocols for security guard duties, stipulations on the work week, uniform requirements, and the overall appearance of workers. (*Id.* at 82-92.)

*Work Environment at the Ferry*

Suarez testified that the workplace at the Ferry was hostile and uncomfortable, characterizing it as a "male-dominated" "locker room environment." (Pl. Dep. Tr. 110-111;

---

[2] Pagination referencing these Agreements is made in accordance with the document page numbers of the Electronic Case Filing system.

2

141.) She testified that male "crew members used the cameras to watch female passengers." (Pl. Dep. Tr. 1021.) For example, male crew members regularly zoomed security cameras "in on [female] passengers ... on their shirt[s] and their breasts and their stomach[s], if they had a short enough shirt. If they had their legs crossed, depending on the camera, they would zoom in between the women's [sic] legs." (Pl. Dep. Tr. 102:19-24.) This practice was "pretty customary," (*id.* at 144:3), despite the fact that employees were not permitted to touch the cameras unless instructed (*id.* at 143:24-25). Furthermore, male deckhands "cheer[ed] the women [passengers] on the boat," (*id.* at 110:17-22), and made comments such as: "check this one's breast [sic] out. 'This one doesn't have her husband here today, maybe you can get to talk to her now.' 'Go see the one in the pink dress upstairs on the bridge deck, she probably doesn't have any panties.'" (*Id.* at 110-111.) Male employees also "hid[] in non-camera areas" and propositioned female passengers for dates. (*Id.* at 111:4-7.) Male employees also frequently "disrespect[ed] female workers," for example, by "[t]alking very vulgar[ly] about" them and openly discussing a female coworker's prowess at oral sex. (Pl. Dep. Tr. 141-142.) Moreover, on several occasions, Suarez witnessed male deckhands and supervisors watching pornography on their cellphones. (Pl. Dep. Tr. 145-146.)

*Alleged Sexual Harassment by Allied Security Guard*

Suarez alleges that in or about May 2010, an Allied security guard, Brandon Warren ("Warren"), sexually harassed her. (Pl. R. 56.1 Stmt. ¶ 3.). Warren served as a security guard at the Ferry's St. George terminal site, where Suarez often worked as a deckhand. (Warren Dep. Tr. 5:20-21.) Suarez alleges that, on several occasions, "Warren ... stare[d] at [her], focusing on her private areas, and ma[d]e noises with his mouth and lips." (Pl. R. 56.1 Stmt. ¶ 5.) While staring at Suarez, Warren "moan[ed]" and "ma[d]e sucking noises with his mouth" while

3

"lick[ing] his lips." (Pl. Tr. 236: 10-14.) This unwanted sexual attention "disturbed, upset and distracted" Suarez, (Pl. Ans. Inter. ¶ 4), and occurred "approximately 4 days per week between May 2010 until about June 19, 2010." (*Id.* ¶ 3.)

*Suarez's Complaints*

Suarez lodged three complaints with the DOT, only the last of which is relevant to her claims against Allied. First, Suarez complained that at some point between January and February 2007, one of her supervisors "leaned back in his chair[,] ... look[ed] at [Suarez] up and down" and asked, "[w]hat [*sic*] you going to give me ... to get a better schedule, Suarez?" (Pl. Dep. Tr. 63-64.) Second, Suarez complained that a passenger grabbed her from behind and "rocked [her] back and forth on [his] penis." (*Id.* at 77:3-6.) Finally, Suarez complained about Warren's conduct.

Suarez reported the first two incidents to Margaret Gordon, the Executive Director of Safety and Security at the DOT. (Gordon Dep. Tr. 3:8-15.) Gordon warned Suarez that if she could not perform her "job right" and could not "deal with passengers pushing [her,] ... [she] should bid off or go find another job." (Pl. Dep. Tr. 81:4-6.) Gordon also told Suarez: "if I was you, I would just stay under the radar." (*Id.* at 81:7-8.) Suarez testified that she felt intimidated and scared of Gordon. (*Id.* at 84:16-24.) On Saturday, June 19, 2010, Suarez reported Warren's conduct to her immediate supervisor at the DOT, Pat Varriale. (Pl. R. 56.1 Stmt. ¶ 8; Pl. Dep. Tr. 94:1-2.) Suarez "never complained to any officials at Allied about ... Warren sexually harassing her or discriminating against her in any other manner," because lodging a complaint with Allied "that was not the procedure." (Pl. R. 56.1 Stmt. ¶ 13.)

4

*Subsequent Actions by DOT and Allied*

The same day that Suarez complained about Warren's behavior, Saturday, June 19, 2010, DOT Inspector, John Arrato, investigated Suarez's claims[3] and immediately notified Allied's District Manager, John McArdle, of the complaint.[4] (McArdle Dep. Tr. 17-18.) The following Monday, June 21, 2010, at a meeting called by Allied "to investigate the situation," McArdle met with Gordon. (*Id.* at 19:8-9, 20:10-20.) At the meeting, McArdle and Gordon discussed the merits of Suarez's complaint and screened a small video clip of security camera footage taken at the Ferry during one of the alleged incidents, which was "not ... entirely conclusive." (*Id.* at 21:11-21.) McArdle proposed a protocol where, if Allied "was notified by the DOT that the complainant was working, [Allied] would attempt to facilitate [Warren] going to a different post to try to reduce incidents where they could come in contact." (*Id.* at 22:2-7.) McArdle asked Gordon if he "could participate in [the] investigation with the complainant and try to resolve the matter." (*Id.* at 21:21-23.) Gordon responded "that it was a DOT investigation and that if [McCardle] was needed[, Gordon] would advise" him. (*Id.* at 21:21-25.)

Following Allied's meeting with Gordon, McArdle met with Warren and "went over Allied[]'s harassment policy, which [Warren] sort of understood." (McArdle Dep. Tr. 22:8-10.) McArdle informed Warren that the "complaints were about what he was doing and that he was leering at [Suarez] in an unprofessional manner, he was maybe moving too close to her." (*Id.* at 22:10-13.) McArdle wanted Warren to understand "what constitutes harassment because sometimes people aren't aware of what they're doing makes [*sic*] other people feel

---

[3] Arrato "review[ed] [] a security video" and concluded that "it did not substantiate plaintiff's complaint." (Pl. R. 56.1 Stmt. ¶ 11.) Arrato also implemented a "temporary fix" for the day of June 19, 2010. (McArdle Dep. Tr. 19:5-7.)

[4] McArdle served as Allied's District Manager in charge of the Ferry account. (McArdle Dep. Tr. 8:2-17.)

5

uncomfortable ...." (*Id.* at 24:21-24.) McArdle also advised Warren that "future instances would constitute harassment." (*Id.* at 22:14-17.) Warren was cautioned that he may have his "post changed." (*Id.* at 22:21-23.) After McArdle's meeting with Warren, Warren was reassigned to work in an upstairs terminal, away from Suarez. (Warren Dep. Tr. 44:16-18; Varriale Dep. Tr. 13:2-3.)

Despite having been relocated, Suarez submits she was still required to "work in the vicinity of Warren, and Warren continued to find excuses to have contact with [Suarez]." (Pl. R. 56.1 Stmt. ¶ 12.) Suarez also alleges that after she complained about Warren, he made a derogatory comment to another individual, which Suarez believes was directed at her, saying: "if you don't stay away from these people, they get you in trouble. These bitches are sensitive around here." (*Id.* at ¶ 7.)

## *The Complaint*

On November 29, 2011, Suarez along with her fiancé, Jerry Mascolo, initiated this action against the City and Allied. (Dkt. No. 1.) The Complaint asserts six causes of action, only one of which pertains to Allied. (Complaint ¶ 46.) That claim, brought only by Suarez, alleges that "Allied subjected Suarez to a hostile work environment in violation of the NYCHRL." (*Id.*) Suarez seeks "a money judgment for [] damages, including but not limited to lost wages, lost benefits, front pay, other economic damages, shame, humiliation, embarrassment and mental distress," along with, "punitive damages against Allied" and "statutory attorneys' fees ... pre-verdict, post-verdict and prejudgment interest and costs." (*Id.* at 6-7.)[5]

## *The Motion for Summary Judgment*

Currently before the Court is Allied's motion for summary judgment under Fed. R. Civ. P. 56. Allied presents two arguments. First, Allied argues that "plaintiff's claims for sexual

---

[5] Warren is not named as a defendant in this action.

6

harassment should be dismissed ... because she is not an employee of Allied and lacks standing to sue under the NYCHRL." (Defendants' Memo at 12.) Second, Allied contends that, even assuming that Suarez's allegations are true, the alleged conduct only amounts to "petty slights and trivial inconveniences," and is therefore not actionable under the NYCHRL. (*Id.* at 17.)

## *DISCUSSION*

### *Standard of Review*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Carett*, 477 U.S. 317, 322 (1986); *see also Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). The moving party bears the burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant must set out specific facts showing a genuine issue for trial. *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins.*, 472 F.3d 33, 41 (2d Cir. 2006). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Nigara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

### I. *Allied, Which was Not Plaintiff's Employer, Can Be Liable Under the NYCHRL*

Allied claims that it cannot be liable to Suarez because it was never her employer. (Defendant's Memo at 12.) Suarez responds that Allied, as the City's agent, can nevertheless be liable because the NYCHRL makes it "unlawful ... [f]or an employer or an employee *or agent*

7

thereof," to discriminate on the basis of gender. N.Y.C. Admin. Code § 8–107(1)(a) (emphasis added).

Courts have emphasized that "the NYCHRL clearly provides for liability not only of an employer, but also for 'an employee or agent thereof.'" *Thomas v. New York City Health & Hospitals Corp.*, No. 02 Civ. 5159(RJH), 2004 WL 1962074, at *9 (S.D.N.Y. Sept. 2, 2004) (quoting N.Y.C. Admin. Code § 8–107(1)(a)); *see also Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (App. Div. 2d Dep't 1998) ("Administrative Code of the City of New York § 8–107(1)(a) expressly provides that it is unlawful for 'an employer or … agent thereof' to engage in discriminatory employment practices."); *cf. Gulino v. New York State Educ. Dep't*, 460 F.3d 361 (2d. Cir. 2006) ("Title VII[, NYCHRL's federal counterpart, also] itself explicitly recognizes that 'any agent' of an employer will be liable for discriminatory behavior.") (citing Title VII). Moreover, as a general principle, it is recognized that "agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal." *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 399 (S.D.N.Y. 2012) (quoting *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120-21 (7th Cir. 1974)). Therefore, Allied's assertion that it cannot be held liable under the NYCHRL unless it was Suarez's employer is without merit – Allied may nevertheless be liable if it was the City's agent. *See Thomas*, 2004 WL 1962074, at *9.

## II. *A Reasonable Factfinder Could Find that Allied was the City's Agent, for Purposes of NYCHRL*

Allied also disputes that it was, in fact, the City's agent. As the "NYCHRL does not define an 'agent,' common law principles apply." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013). "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his

8

behalf and subject to his control, and the consent by the other to act.'" *New York Marine & General Ins. Co. v. Tradeline LLC*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 436 N.Y.S.2d 496, 499 (App. Div. 4th Dep't 1981)). "An agency relationship exists ... when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent." *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005). "The element of control often is deemed the essential characteristic of the principal-agent relationship.'" *White*, 973 F. Supp. 2d at 377 (quoting *Saleh v. Pretty Girl, Inc.*, No. 09 Civ. 1769(ENV)(RER), 2012 WL 4511372, at *9 (E.D.N.Y. Sept. 28, 2012)).

It is undisputed that Allied entered into numerous agreements with the City to provide, *inter alia*, security "[g]uard services for multiple users throughout the City of New York." (*Id.* at 82.) Additionally, there is sufficient evidence in the record from which a reasonable factfinder could conclude that Allied acted on behalf of the City, with the City's consent. Under the terms of the Agreements, Allied agreed to hire, fire, and manage security guards for various City sites, designate individual security guards to specific City locations, and allocate equipment. (Exhibit 1 on Reply, Dkt. No. 62-27:37, 82; McArdle Dep. Tr. 13:3-7, 32:7-16.) Pursuant to the Agreement, McArdle supervised approximately 15,000 hours of security services for the City, including services at the Ferry. (McArdle Dep. Tr. 5-6.) The Agreements between the City and Allied evince at least some "manifestation of consent by one person to another that the other shall act on his behalf and ... consent by the other to act." *New York Marine*, 266 F.3d at 122 (citation omitted).

A reasonable factfinder could also find the presence of the principal's control over the agent – the final requirement of an agency relationship. Although Allied was afforded some

9

discretion in the administration of security services, the record demonstrates that much of Allied's work was structured and controlled by the City. (Exhibit 1 on Reply, Dkt. No. 62-27.) The City controlled, *inter alia*: the maximum daily work hours per worker, the specific start and end times of every shift, lunch breaks, specific overtime stipulations, the number of workers, mandated drug tests, various hiring criteria, and employee rosters; the City also reserved a right to interview Allied executives to determine the manner in which guards were assigned and reserved the right to interview and reject any assigned guards. (*Id.*) In *Jiggetts v. Local 32BJ, SEIU*, assessing some of the same contractual terms governing Allied's relationship with the DOT, the Southern District of New York concluded that there was "evidence suggesting the City had control over how the security guards were placed on its sites," and thus, "the City [was] not entitled to summary judgment on the basis of the purported lack of an employment relationship with the plaintiff." No. 10 Civ. 9082 (DAB) (JCF), 2011 WL 4056312, at *8 (S.D.N.Y. 2011) (considering analogous element of control in context of joint employer doctrine). Moreover, the fact that Allied expressly sought and was denied permission to join the investigation into Suarez's allegations against Warren militates in favor of finding that the City exercised control over Allied. (McArdle Dep. Tr. 21:21-25.) Given that Allied relinquished control to the DOT over an investigation involving its own security guard, a reasonable factfinder could conclude that Allied was not free to act independently of the City, but rather, was beholden to the City's control to the extent necessary to underlie an agency relationship. Accordingly, a reasonable factfinder could conclude that Allied acted as the City's agent.[6] *See Parmalat*, 375 F. Supp. 2d at 290.

---

[6] Allied's argument that it is a contractor and not an agent is without merit. First, the relationship here differs from that of a non-agent independent contractor, in which an independent contractor exercises "independent employment," and "'contracts to do certain work according to his own methods, and without being subject to the control of his employer ....'"

10

### *III. What are the Limits of Agent-Liability under NYCHRL?*

This case presents the novel question of the limits on the liability of an agent under NYCHRL in cases where an agent's employee acts in an unlawful manner towards a principal's employee. As a preliminary matter, this Court notes that in 2005, the New York City Council found that the NYCHRL was being "construed too narrowly," and in response, passed the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), which introduced two guiding principles in interpreting the NYCHRL: first, "federal and state civil rights laws" are "a floor below which the City's Human Rights law cannot fall," Restoration Act § 1; and, second, the NYCHRL is to be construed "liberally for the accomplishment of [its] uniquely broad and remedial purposes ...," Restoration Act § 7. Guided by these principals, the Court considers the scope of an agent's liability under the NYCHRL.

As explained above, it is "unlawful ... [under the NYCHRL f]or an employer or an employee or agent thereof," to discriminate on the basis of gender. N.Y.C. Admin. Code § 8–107(1)(a). An employee is only liable if he or she "actually participates in the conduct giving rise to the plaintiff's ... claim." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366-67 (S.D.N.Y. 2012). In *Malenda*, the court denied summary judgment to the plaintiff's coworker, who "did not have authority to hire or fire Plaintiff or to unilaterally set Plaintiff's schedule, hours, or salary" because the NYCHRL imposes liability not only on employers, but also on employees and agents "regardless of ownership or decisionmaking power," so long as the

---

*Cubby, Inc. v. Compuserve, Inc.*, 776 F. Supp. 135, 142 (S.D.N.Y. 1991) (quoting *Murray Hill Films, Inc. v. Martinair Holland, N.V.*, No. 86 Civ. 7477 (RLC), 1987 WL 14918, at *3 (S.D.N.Y. July 17, 1987)). Furthermore, determining that a particular entity served as an independent contractor does not necessarily preclude finding an agent-principal relationship. *See Time Warner City Cable v. Adelphi University*, 813 N.Y.S.2d 114, 116 (App. Div. 2d Dep't 2006) (finding that defendant entities' statuses as independent contractors did not preclude a finding that they were also agents) (citing cases).

11

individual "actually participates in the conduct giving rise to the plaintiff's ... claim." *Id.* at 366, 366 (internal citation and quotation marks omitted); *see also Najjar v. Mirecki*, No. 11 CIV. 5138 KBF, 2013 WL 3306777, at *4 (S.D.N.Y. July 2, 2013) (observing that "[t]he NYCHRL also includes 'employees or agents' of the employer as covered parties, at least where those parties directly take adverse action against the employee"). Just as an employee cannot be held liable under the NYCHRL unless he or she participates in the unlawful conduct, so too, it follows, an agent should not be liable unless it directly participated in the discriminatory conduct. To hold otherwise would twist the language of the statute, which plainly provides that it is "unlawful ... for an ... employee or agent ... because of the ... gender ... of any person ... to discriminate against such person," N.Y.C. Admin. Code § 8–107(1)(a), and would make little sense, in that it would hold agents liable for *any* discrimination suffered by the employees of its principal, regardless of the agent's involvement in the unlawful conduct.

Here, Suarez alleges that Warren, an Allied employee, directly engaged in conduct giving rise to her claims. The question is thus, under what circumstances can Allied, as Warren's employer, be said to have directly participated in Warren's conduct. Although the statute is silent on the limits on an agent's liability for the conduct of its employees, this Court looks to N.Y.C. Admin. Code § 8–107(13)(b), which governs an employer's liability for the conduct of its employees. NYCHRL § 8–107(13)(b) "imposes liability on the employer [for its employee's conduct] in three instances: (1) where the offending employee 'exercised managerial or supervisory responsibility' ...; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action'; and (3) where the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet 'failed to exercise reasonable diligence to

12

prevent [it].'" *Zakrzewska v. New Sch.*, 14 N.Y.3d 469 (2010) (quoting N.Y.C. Admin. Code § 8–107(13)(b)). Thus, under the NYCHRL, a plaintiff's direct employer is not strictly liable for the conduct of its non-supervisory employees.

Section 8–107(13)(b) of the NYCHRL does not expressly apply to agents, such as Allied. However, this Court holds that § 8–107(13)(b) should apply with equal force to an agent, sued in its capacity as an employer of an individual who engages in discriminatory conduct, as it would to an employer, sued in such a capacity. The Court so holds because it would make little sense to hold an agent strictly liable for the conduct of its non-supervisory employees, while a plaintiff's direct-employer's liability is limited to circumstances where it knew or should have known about the conduct. Thus, where a plaintiff sues an agent based on the discriminatory acts of the agent's non-supervisory employee, the agent can only be held liable if a reasonable factfinder could conclude that it "knew [or should have known] of the offending employee's unlawful discriminatory conduct and acquiesced in it" or "failed to exercise reasonable diligence to prevent [it]." *Zakrzewska*, 14 N.Y.3d at 479.

Here, there is insufficient evidence from which a reasonable trier of fact could find that Allied knew or should have known about Warren's conduct. Suarez does not dispute that she did not complain about Warren's conduct to either the DOT or Allied before lodging a complaint with the DOT on June 19, 2010. (Pl. R. 56.1 Stmt. ¶13; McArdle Dep. Tr. 17-18.) Nor does she contend that Allied should have known about Warren's conduct before she made her complaint. The record indicates that, upon learning of Suarez's allegations, Allied took immediate and swift action to address Suarez's complaint by scheduling a meeting with Gordon, reviewing Allied's harassment policies with Warren, and relocating Warren away from Suarez. (McArdle Dep. Tr. at 22:2-7; Warren Dep. Tr. 44:16-18.) While Suarez alleges that Warren continued to stare at her

13

in a menacing way and made one derogatory comment that *may* have been directed towards her, Suarez's own testimony clearly demonstrates that Warren's sexually charged conduct ceased after Allied learned of her complaints. (Pl. R. 56.1 Stmt. ¶ 14.) Drawing all inferences in favor of Suarez, no reasonable factfinder could conclude that Allied had or should have had any knowledge of Warren's discriminatory conduct prior to Suarez's June 19, 2010 complaint, or that Allied's response, upon learning of the discriminatory conduct, did not constitute appropriate corrective action.[7] Accordingly, Allied cannot be held liable under the NYCHRL for Warren's conduct and its motion for summary judgment is granted.

---

[7] To the extent that Suarez's claim is based on Allied's response to her complaint, no reasonable factfinder could find Warren's conduct after June 19, 2010 actionable. Under the NYCHRL, defendants may assert "an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (App. Div. 1st Dep't 2009). The NYCHRL is not intended to operate as a "general civility code." *Id.* at 41 n.30 (quoting *Oncale v. Offshore Servs.* 523 U.S. 75, 81 (1998)). Instead, the NYCHRL protects against instances where an individual's terms and conditions of employment are altered by a discriminatory practice. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (finding that "forcing a targeted employee to suffer 'unwanted gender-based conduct' imposes a different term or condition of employment on her.") (quoting *Williams*, 872 N.Y.S.2d at 38).

However inappropriate or derogatory, Warren's behavior *following* Suarez's complaint cannot be said to have sufficiently altered the 'terms and conditions' of Suarez's employment. (Pl. Cont'd Dep. Tr. 197:7.) Suarez concedes that after lodging a complaint, "Warren [no longer] ma[de] obscene and vulgar gestures and noises directed at her; rather, … [he] engaged in a campaign of intimidation." (Pl. R. 56.1 Stmt. ¶ 16.) According to Suarez's testimony, this "campaign of intimidation" consisted of a "very nasty, angrily [*sic*] stare," (Pl. Dep. Tr. 140:8-9), and a lone derogatory comment that may have been directed at Suarez. These limited and sporadic instances amount to no more than petty slights and trivial inconveniences. *See Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 450 (E.D.N.Y. 2013) ("Isolated incidents of unwelcome verbal and physical conduct have been found to constitute the type of 'petty slights and trivial inconveniences' that are not actionable even under the more liberal NYCHRL standard."). Thus, no reasonable factfinder could find that Allied failed to take "immediate and appropriate corrective action." NYCHRL § 8–107(13)(b)(2).

## *CONCLUSION*

For the foregoing reasons, Allied's motion for summary judgment is granted.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: March 31, 2015
Brooklyn, New York